DAVID L. MOSS & CO., INC. *v.* UNITED STATES (No. 4348) [1]

United States Court of Customs and Patent Appeals, April 27, 1942

*O'Connor and Farber* (*Arnold T. Koch* and *Daniel P. McDonald* of counsel) for appellant.

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

[1] C. A. D. 206.

2

[Oral argument February 5, 1942, by Mr. Koch, Mr. McDonald, and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, holding merchandise exported from China, described on the consular invoice and entry as "Dried Hen Egg Albumen" and in appellant's protest as "Hen Egg Albumen," dutiable, as assessed by the collector at the port of New York, at 27 cents per pound under paragraph 713 of the Tariff Act of 1930 (as amended by Presidential proclamation, dated June 29, 1931, T. D. 44997, increasing the rate of duty on dried egg albumen from 18 cents per pound to 27 cents per pound), rather than as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1558 of that act as claimed by counsel for appellant.

The paragraphs in question read:

PAR. 713. Eggs of poultry, in the shell, 10 cents per dozen; whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved, and not specially provided for, whether or not sugar or other material is added, 11 cents per pound; dried whole eggs, dried egg yolk, and dried egg albumen, whether or not sugar or other material is added, 18 cents per pound.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Appellant called as witnesses Lewis P. Schrag, vice president of the appellant company; Harvey A. Seil, a chemist associated with the firm of Seil, Putt & Rusby, Inc., and chemist for the Dried Egg Dealers' Association in New York City; Louis Bisno, chief chemist for the Wagner Baking Corporation of Newark, N. J.; A. Lloyd Taylor, "director of the Department of Chemistry, Pease Laboratories" in New York City; and Victor W. Henningsen, president of Henningsen Brothers, Inc., of New York, engaged in importing dried and frozen eggs and also in the production of such eggs in the United States.

The witness Schrag testified that the involved merchandise was produced in China by the *fermentation process* which he described as follows:

The egg whites are separated from the yolk after being broken out from the shells, and the egg whites are then placed in vats or casks for a period of from 3 to 5 days in order that they ferment. At this time—3 to 5 days depends upon the temperature; the cooler the temperature the longer the time necessary to complete the fermentation process.

During the fermentation period a scum forms on the top of the liquid egg whites and brings to the top chalaza and strings and bits of insoluble matter, and there is also a sediment of pieces of eggshell dropped to the bottom.

When the fermentation is completed there remains a clear, thin liquid, which is drawn off, neutralized by the addition of ammonia, placed in shallow pans or trays in heated chambers until they are dried into crystalline form, that is, the moisture is substantially removed, leaving a moisture content of about 12 to 14 per cent.

When that is done the crystals or flakes are broken up into more or less uniform size, packed in 200-pound tin-lined wooden cases, and are ready for shipment abroad.

The witness also described a process for producing *unfermented* dried egg albumen in China. That process, he stated—

involves the separation of the whites from the yolks after they are broken out from the shells, churned up for a short time, and then placed, promptly placed in pans or trays and dried, so that the moisture is substantially removed, leaving the moisture also in that case of about 12 to 14 per cent.

The witness identified Exhibit 1, which consists of a glass jar containing a sample of the merchandise in question.

The involved "Dried Hen Egg Albumen" appears to be in the form of crystals or flakes, light amber in color. It has an odor which the witness Harvey A. Seil described as a "characteristic fermented odor."

The witness Schrag also identified Illustrative Exhibit A, which consists of a glass jar containing a sample of *unfermented* dried egg albumen which has been kept at ordinary room temperature for some time. The sample of unfermented dried egg albumen is crystalline in form, of reddish-brown color, and is practically odorless.

The witness Schrag further testified that fermented dried egg albumen, such as that here involved, is used by candy manufacturers and by manufacturers of meringue; that it produces a "foamy whip of meringue, whereas the unfermented would be a thick, stable but low whip"; that fermentation of egg albumen begins in the shell as soon as the egg is laid; that when removed from the shell, the egg albumen ferments rapidly at room temperatures; that the length of time required to complete the fermentation process by means of which the involved egg albumen was produced is controlled principally by temperature; that his company manufactured *unfermented* dried egg albumen in the United States in 1933; that it was dried by the spray process; that his company could not find any successful commercial use for such dried egg albumen; and that he did not know whether anyone else was able to find a successful use for such a product.

It appears from the testimony of appellant's witnesses that unless *unfermented* dried egg albumen is kept under refrigeration it will change color, becoming reddish-brown, and will also become insoluble in water; that if it is kept under refrigeration it will not discolor or

become insoluble in water; that *fermented* dried hen egg albumen, such as that here involved, does not deteriorate and does not change in color or become insoluble in water if kept at ordinary room temperatures; that *unfermented* dried egg albumen is known in the trade as *dried egg albumen,* whereas the *fermented* dried egg albumen is known in the trade as *dried egg albumen, dried egg albumen crystals,* and *dried egg albumen flakes;* that fresh liquid egg albumen contains approximately 3.3 per centum of sugar, dry weight; that it is alkaline in character; that *unfermented* dried egg albumen is also alkaline and contains all of the essential elements of liquid egg albumen, whereas *fermented* dried egg albumen, as a result of fermentation, contains no sugar and is acid in character; and that the principal differences between *unfermented* dried egg albumen, of which exhibit A is representative, and the involved *fermented* dried egg albumen, of which Exhibit 1 is representative, are, as stated by the witness Seil, as follows:

Exhibit 1 has a characteristic fermented odor, whereas Exhibit A is practically odorless. Secondly, Exhibit 1 has no sugar in it, and Exhibit A contains sugar. Thirdly, Exhibit 1 is acid, and Exhibit A is alkaline.

The witness Louis Bisno, whose testimony is consistent with the views expressed by the witness Schrag, in describing the differences observed by him in the use of *unfermented* dried egg albumen and *fermented* dried egg albumen, stated that—

when soaked up in water the unfermented product had a body of viscosity resembling that of fresh egg white, a sliminess which was not shown by the fermented. In soaking up in water the product was on the alkaline side rather than on the acid side, the latter characteristic being shown by fermented albumen. *In whipping up to make meringues the action of the 2 products was entirely different. The fermented product whips up very readily, giving a foam in a very small time, whereas the unfermented did not whip up readily at all. We found that I had to change procedure in order to get it to whip up at all in a satisfactory manner.*

\* \* \* \* \* \* \*

when the unfermented egg white is soaked up in water and reconstituted it has an odor very much suggestive of fresh egg whites, whereas the fermented product has an odor which is foreign to egg white.

\* \* \* \* \* \* \*

If we attempt to take unfermented egg white and use it in *exactly* the same way as fermented egg white we obtain a foam with large air cells, as compared with very fine air cells with a fermented product. We obtain a foam which is not as large in volume as the other; we obtain a foam which waters and breaks down readily and which cannot be used commercially. [Italics ours.]

The witness also testified that the fermented product produces "A quicker, finer grained whip when the 2 are handled under the same conditions. The unfermented may be used to give a fine whip *but conditions have got to be altered materially.*" [Italics ours.] (What those conditions are, the witness did not explain.) It further appears from the testimony of the witness that he had never been able to secure exactly the "same texture with the 2 products."

Appellant's witnesses Seil and Taylor testified that, in their opinion, *dried egg albumen was egg albumen from which the moisture only had been removed,* and that, owing to the fact that the involved merchandise had been subjected to the fermentation process and as a result the sugar had been removed and the alkaline properties of the egg albumen had been changed to acid, it was not dried egg albumen, but was a manufacture of egg albumen.

It will be recalled that the witness Schrag testified that after the completion of the fermentation process, the clear, thin liquid which remained was neutralized by adding ammonia. As ammonia is alkaline and combines with acids to form ammonium salts (see Webster's New International Dictionary), it would seem to be clear that the purpose of adding the ammonia was to arrest fermentation. This is in conformity with the views of counsel for appellant, who state in their brief that "when the albumen has fermented sufficiently the necessary amount of ammonia is added to neutralize the liquid. This stops fermentation. It is then dried in pans in a heated room."

Dr. Seil testified that during the drying process "the ammonia would be volatilized." He further stated that if that were not so, the involved product would be alkaline, not acid.

It is apparent, therefore, that, although substantial fermentation has taken place, the egg albumen prepared by the process described by the witness Schrag has not been completely fermented.

The Government called 5 witnesses: Benjamin R. Harris, a chemist, a member of the firm of Epstein, Reynolds & Harris (consulting chemists and engineers), and vice president of the Emulsol Corporation of Chicago, which corporation is engaged in the freezing and drying of eggs and egg products, one of its products being dried egg albumen; and the following employees of Armour & Co. which company produces, among other things, dried egg albumen: George U. Vanneman, a salesman; John R. Turner, a salesman and demonstrator of dried egg albumen; Victor Conquest, a research director; and H. Lawrence Keil, a research biochemist.

It appears from the testimony of the witness Harris that the dried egg albumen sold by The Emulsol Corporation is prepared substantially as follows: A quantity of liquid egg albumen is permitted to stand at room temperature for a period of from 4 to 6 days (during which time substantial fermentation undoubtedly takes place). The fermented egg albumen is then added to fresh liquid egg albumen in the ratio of 1 to 10, that is, 1 part of the fermented albumen to 10 parts of the fresh albumen. The combined batch is then kept at 70° F. for a period of approximately 18 hours (during which time, the witness stated, some fermentation occurs). A small amount of ammonia is then added and the material placed in pans and warm air circulated over it until it is dry. The resultant product of that process is sold as

dried egg albumen. It contains no free sugar. The witness further testified that he subjected a sample of the involved merchandise, together with a sample of the product produced by The Emulsol Corporation, to various tests for the purpose of ascertaining and comparing their properties; that both were slightly acid, and within the normal range for dried egg albumens; that the involved merchandise produced a whip of 8 inches, which is a characteristic whip for dried egg albumen. Other tests were made and detailed by the witness which, he stated, clearly indicated to him that the involved merchandise was dried egg albumen. When asked to define dried egg albumen, the witness said: "In my opinion dried egg albumen is liquid egg white minus most of its moisture, in the form of a substantially dry material, which when redissolved in water functions practically in the same way, substantially for the same purposes and substantially with the same results as liquid egg whites."

The witness Vanneman testified that it was his duty to demonstrate the use of the dried egg albumen produced by Armour & Co. to manufacturers of bakery and confectionery products; that he had frequently come in contact with dried egg albumen like that here involved; that it was used for substantially the same purposes and produced substantially the same results as the dried egg albumen produced by Armour & Co.; and that he had seen so-called "Chinese fermented" dried egg albumen used in the making of "icings, meringue toppings for pies, and marshmallow and various candy products."

The witness John R. Turner stated that the dried egg albumen produced by Armour & Co. was known in the trade as dried egg albumen, powdered egg albumen, and powdered egg whites; that the Armour product and merchandise like that here involved were used for the same purposes; that the Armour product had a sweet, fresh egg odor, comparable to the odor of liquid egg albumen; that the odor of Chinese fermented dried egg albumen varied from one that was mild to one that was strong; that when the odor is strong, it is necessary that it be overcome by using an excess of vanilla flavoring. In comparing the *fermented* with the *unfermented* dried egg albumen when used for making meringue, the witness stated that it might be necessary in some instances to change the formula used by the baker. (Neither the formula nor the necessary change therein was described by the witness.)

The witness Victor Conquest testified that the Armour & Co.'s powdered dried egg albumen was prepared substantially as follows: The liquid egg albumen is put in vats holding from 15,000 to 17,000 pounds and treated with hydrochloric acid in order to adjust its pH; that is, to change its properties from alkaline to acid. (The pH referred to by the witness is a chemical expression which, when used

with numerals, indicates whether a material is acid, alkaline, or neutral. All pH determinations above seven indicate an alkaline reaction. Seven is the neutral number, and all determinations below seven indicate an acid reaction.) The hydrochloric acid also acts to prevent certain kinds of fermentation and to favor others. The albumen is stirred continuously throughout a period of not less than 3 days and not more than 3½ days. The liquid is then pumped through a high-pressure pump into a spray drying machine where it is dried. The witness stated that there are filters in the high-pressure line which filter out pieces of shell, chalaza, and other undesirable solid matter. When asked what amount of hydrochloric acid was used in making the Armour & Co. product, the witness said: "It varies to some degree with pH of the original egg. For instance, if we have a high pH on our egg it takes a little more acid. If we should get eggs with a low pH it doesn't take so much." The witness also stated that the Armour & Co. product prepared in the manner hereinbefore set forth contains no free sugar. When asked to define dried egg albumen, the witness said: "Dried egg albumen is liquid egg whites which have been substantially reduced in their moisture content, let's say, to the point where they can be handled as a dry product, maybe 5 or 14 per cent of moisture, and which upon reconstituting have substantially the same properties and utility as fresh egg albumen." The witness further stated that he, in conjunction with the witness H. Lawrence Keil, had performed certain experiments in order to determine whether the involved merchandise was comparable to other dried egg albumens, such as those produced by Armour & Co. and The Emulsol Corporation, and that from those experiments he had concluded that the involved merchandise was dried egg albumen.

The witness H. Lawrence Keil testified that he analyzed and compared the dried egg albumens produced by The Emulsol Corporation and Armour & Co., a sample of the involved merchandise, and unfermented dried egg albumen. His testimony with regard to such analyses is technical and rather lengthy, and no good purpose could be served by setting it forth here. It is sufficient to say that he described the tests to which he subjected the various egg albumens analyzed by him, which, he stated, were the normal tests to which egg albumens are subjected for the purpose of determining their properties, and that he concluded from such tests that the involved merchandise and the dried egg albumens produced by The Emulsol Corporation and Armour & Co., although varying slightly in some respects, were all dried egg albumens and possessed the properties, both physical and chemical, of dried egg albumens.

In holding that the involved merchandise was dried egg albumen and dutiable as such under paragraph 713, *supra*, as amended by

Presidential proclamation, the trial court, in an opinion by Evans, Judge, among other things, said:

From the various tests to which the instant commodity has been submitted, which are the usual tests for examining egg albumen, it is apparent that it is comparable with other dried egg albumens both in chemical and physical characteristics. As stated above, there are numerous processes of preparing dried egg albumen and we find that the process used in preparing the commodity now before us produces a resulting product which is used in the same way as other commercially recognized dried egg albumens and is similar in both physical and chemical characteristics to such dried egg albumens and has no new name, character, or use from such well-known products.

The court also stated that if the involved merchandise was not dutiable directly under paragraph 713, *supra*, it was dutiable thereunder by virtue of the similitude clause contained in paragraph 1559 of the Tariff Act of 1930, and, accordingly, overruled appellant's protest.

It is the contention here of counsel for appellant that the Congress intended that the provision for dried whole eggs, dried egg yolk, and dried egg albumen contained in paragraph 713, *supra*, should cover only whole eggs, egg yolks, and egg albumens from which the moisture content had been substantially removed, and that it did not intend to include within that provision whole eggs, egg yolks, or egg albumens which had been otherwise processed; that it has been established in the instant case that the common meaning of the term "dried egg albumen" is limited to egg albumen from which only the moisture content has been removed and which, when dissolved in water, functions in substantially the same way and for substantially the same purpose and accomplishes substantially the same results as liquid egg whites. It is further contended by counsel for appellant that the involved so-called "fermented dried egg albumen" is not dried egg albumen, but is a manufacture of egg albumen, and that it differs both physically and chemically from unfermented dried egg albumen in the following particulars: The fermented has an acid reaction, whereas the unfermented has an alkaline reaction; the fermented contains no sugar, whereas the unfermented contains approximately 3.5 per centum; the fermented has a strong fermented odor, whereas the unfermented has an odor suggestive of fresh eggs; the fermented will keep indefinitely at room temperatures without changing color or becoming insoluble in water, whereas the unfermented must be kept under refrigeration or it will discolor slowly and become insoluble in water and, therefore, unsalable; the fermented, when soaked in water, has a "viscosity of water" and whips up readily, producing a light, high foam or whip, whereas the unfermented, when soaked in water, has a "body viscosity" resembling fresh egg whites, does not whip up readily, and produces a low, tough foam or whip. Counsel further contend that the fermented dried egg albumen cannot

be substituted for the unfermented without changing conditions of use (just what changes, is not explained); that the dried egg albumens prepared by The Emulsol Corporation and Armour & Co. are subjected to fermentation processes; that they are fermented dried egg albumens; and that, "with the exception of the fact that by a newer and more scientific technique the bad odor in such [the Armour and Emulsol] products has been avoided to an appreciable degree," the involved product and the Armour and Emulsol products are almost identical in use and in physical and chemical properties.

It is apparent from the record that the involved merchandise and the dried egg albumens prepared by The Emulsol Corporation and Armour & Co. are substantially, but not completely, fermented; that there are various processes used in producing dried egg albumen; that some dried egg albumens are unfermented and some are partially fermented; that some fermented dried egg albumens, such as that here involved, have an unpleasant odor; that where such an odor would impair the quality of the finished product, it is necessary that it be overcome by using an excess of vanilla flavoring; and that in order to substitute the so-called "fermented" for the unfermented dried egg albumen it may be necessary to alter the conditions under which the unfermented is used. Nevertheless, both the *fermented* and the *unfermented* dried egg albumens are used for substantially the same purposes, although the manner of employment and the results obtained may differ somewhat, depending upon the method of preparation.

In the case of *F. H. Shallus & Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 332, T. D. 44585, merchandise similar to that here involved was held to be dutiable as dried egg albumen under paragraph 713 of the Tariff Act of 1922. It was contended by counsel for appellants that the dried egg albumen there involved was dutiable alternatively as egg albumen, prepared or preserved, under paragraph 713, *supra*, or as a nonenumerated manufactured article under paragraph 1559 of that act.

Although it was contended in that case that as the imported merchandise was produced by a fermentation process, it was not dried egg albumen, but was a manufacture of egg albumen, the court, for reasons stated in our decision, did not pass upon that issue. We held, however, that although the egg albumen there involved had been prepared and was, therefore, covered by the provision for egg albumen, prepared or preserved, it had also been dried and was more specifically provided for as dried egg albumen.

That the Congress did not intend that the provision for dried egg albumen contained in paragraph 713, *supra*, should be limited to any particular kind of dried egg albumen, but did intend that it should include all dried egg albumens regardless of their form or the method

by which they were produced (see *United States* v. *D. L. Moss & Co.,* 22 C. C. P. A. (Customs) 249, T. D. 47159) is evidenced by the fact that it expressly provided for "dried egg albumen, whether or not sugar or other material is added." Surely, the Congress must have had in mind that dried egg albumen to which sugar or other material had been added would possess properties not possessed by either fresh liquid egg albumen or unfermented dried egg albumen to which nothing had been added. If that is so, and we think it is, it is evident that the Congress did not contemplate that all dried egg albumens would be used for precisely the same purposes or that they would produce the same results when used in the same manner. Accordingly, we are unable to adopt the views urged upon us by counsel for appellant that the Congress intended to limit the dried egg albumen provision contained in paragraph 713, *supra,* to unfermented dried egg albumen.

The involved merchandise is bought and sold in the trade in the United States as dried egg albumen, dried egg albumen crystals, and dried egg albumen flakes. It has no use other than that of dried egg albumen. We must hold, therefore, that, whatever may be the common meaning or trade understanding of the term "dried egg albumen," the involved merchandise is dried egg albumen within the purview of paragraph 713, *supra,* and that it is dutiable under that paragraph at 27 cents per pound as assessed by the collector and as held by the trial court.

For the reasons stated, the judgment is *affirmed.*